Chief Judge Conway.
Petitioner is an author of novels, plays, motion picture scripts, magazine articles and other literary works. In April of 1952 he filed returns under the New York City General Business and Financial Tax Law (commonly known and hereinafter referred to as the “ Gross Receipts Tax”) covering the following periods: January 12, 1943 to December 31,1944; October 1,1945 to August 30,1948; January 1, 1950 to June 30, 1950, and paid the tax and interest thereon. The comptroller denied a refund following which the present proceeding was instituted to review that determination. Thereafter, the parties stipulated that the total amount paid represented, in part, taxes and interest attributable to literary works of petitioner prior to the time he became a resident of New York City. They further stipulated that the city would pay petitioner the sum of $251.24 and that in the event the petitioner were fully successful in this proceeding the refund will be limited to the sum of $531.09 principal of tax and $133.73 interest or a total of $664.82.
It is conceded that petitioner was a resident of New York City and wrote numerous novels, motion picture scripts, plays, newspaper and magazine articles and radio scripts during the three periods here involved. Through his literary agents located in New York City, petitioner negotiated for the licensing of certain rights in his literary works. The agents’ principal function was to negotiate such contracts for Mr. Steinbeck and they had complete authority and discretion in so doing. Indeed, they even executed contracts on his behalf. Certain of the author’s rights were licensed by the agents orally as “ a cash deal ”. He did *307 not sell the copyright to his works. He merely licensed certain rights in them to others.
Respondents’ Exhibits D, H and I are examples of the type of contract executed by petitioner in New York City. They purport to grant certain of his rights in his literary works. As to books, the consideration to be paid to him consists of a percentage of the amount charged by the publisher for all copies sold, less copies returned, but with “ no deduction for cash discounts or bad debts ’ ’. This percentage is characterized as “ royalties ”. As to motion picture scripts, magazine and newspaper articles, and plays, the consideration consists of a lump sum or a percentage or a combination of the two. The agents would receive the royalty moneys, take their commission and deposit the balance in Mr. Steinbeck’s bank account.
The Gross Receipts Tax (Administrative Code of City of New York, ch. 46, tit. B) is imposed pursuant to section 24-a of the General City Law which authorizes New York City to impose ‘ ‘ a tax # * * upon persons carrying on or exercising for gain or profit within such city, any trade, business, profession, vocation or commercial activity * * * or making sales within such city”. The tax is to be ‘ ‘ measured by the gross receipts from such activities carried on or sales made within the city * *
In his petition Steinbeck alleged that the tax levied on him, and paid under protest, was collected erroneously, illegally and unconstitutionally because
(a) his activities in New York City did not constitute a trade, business or other activity within the meaning of the tax statute ;
(b) the Gross Receipts Tax is a tax on privileges secured by the First and Fourteenth Amendments to the Constitution of the United States and section 8 of article I of the Constitution of the State of New York;
(c) his activities in New York City other than writing were de minimis and not subject to tax; and
(d) the tax was levied, in part, on royalties derived from interstate and foreign commerce, in violation of section 8 of article I of the United States Constitution.
The Gross Receipts Tax applies to persons “ carrying on or exercising for gain or profit within * * * [the city of New York] any trade, business, profession, vocation or commercial *308 activity * * * ” so long as the gross receipts therefrom exceed $10,000 per annum (Administrative Code, § B46-2.0). Insofar as the interpretation of a statute is concerned there are four kinds of terms or words, to wit, common, technical, legal, and trade or commercial (2 Sutherland on Statutory Construction [3d ed.], § 4919). Manifestly, the words found in the Gross Receipts Tax are common words. Moreover, it is well settled that a ‘ ‘ tax law should be interpreted as the ordinary person reading it would interpret it.” (Howitt v. Street & Smith Pub., 276 N. Y. 345, 351; Matter of Business Statistics Organization v. Joseph, 299 N. Y. 443, 449.) Common words are to be given their commonly understood meaning unless another meaning is obviously intended (see McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 232). Since there is nothing in the Gross Receipts Tax to suggest — even remotely — that the lawmakers intended to confer a special or restricted meaning on the terms therein used, we may look to the legal dictionaries for the generally accepted common definition of such terms. The word “ trade ” has the broad definition of “ Any sort of dealings by way of sale or exchange; commerce, traffic.” (Bouvier’s Law Dictionary [8th ed.], Yol. Ill, pp. 3290-3291.) “ Business ” has been described as a word of ‘ ‘ large * * * import ”, a “ very comprehensive term ”. It encompasses “ That which occupies the time, attention and labor of men for the purpose of livelihood or profit, but it is not necessary that it should be the sole occupation or employment. It embraces everything about which a person can be employed”. (Bouvier’s Law Dictionary [8th ed.], Yol. I, p. 406; Flint v. Stone Tracy Co., 220 U. S. 107, 171.) “Profession ” has been defined as a “ vocation, calling, occupation or employment involving labor, skill, education, special knowledge and compensation or profit, but the labor and skill involved is predominantly mental or intellectual, rather than physical-or manual.” (Black’s Law Dictionary [4th ed.], p. 1375.) A “ vocation ” is “ One’s regular calling or business.” — ‘ ‘ The activity on which one spends major portion of his time and out of which he makes his living.” (Id., p. 1745.) “ Commercial activity ’ ’, of course, is activity relating to or connected with trade and traffic or commerce in general. .(See Black’s Law Dictionary [4th ed.], p. 337.) Thus, it will be seen that the broadest of terms have been employed in the Gross Receipts Tax. *309 Indeed, it is difficult to conceive of a more all-embracing tax. The sweep of the statute is so great that it was deemed necessary to provide expressly that the phrase, exercising any profession, vocation, trade, business or commercial activity, “ [d]oes not include labor or services rendered by an individual for a wage or salary.” (Administrative Code, § B46-1.0, subd. 5.)
Petitioner Steinbeck earns his livelihood as an author, reaping profits from the sale of his literary endeavors. It cannot be doubted that in so doing petitioner is carrying on or exercising for gain or profit a trade, business, profession, vocation or commercial activity as those terms are commonly understood.
In an effort to demonstrate that he is not engaged in “ business ”, the petitioner cites People ex rel. Nauss v. Graves (283 N. Y. 383). The question there presented was whether the owners in common of certain realty were engaged in business within the meaning of article 16-A of the Tax Law which imposed a 11 Temporary emergency tax on net incomes of unincorporated businesses.” The relators had inherited the subject real estate and had engaged another to manage it. After pointing out that the term “ business ” is of very broad significance and has a great variety of meanings, this court wrote (pp. 386-388): ‘ ‘ When used in tax statutes similar to that involved in the case at bar, ‘ business ’ or ‘ doing business ’ connote something more than the ownership of property and the receipt of income derived from property. [Cases cited.] Although the very nature of the case does not permit an exact formula by which to determine when the activities of a property owner amount to the doing of business, there has been evolved the principle which distinguishes between a passive and an active owner or investor. One who allocates the active administration of the properties to others and himself performs only such acts as are appropriate to safeguard his ownership, is to be distinguished from one who himself actively participates in administering the management of the properties. The question is one which depends upon the facts of the particular case. [Case cited.] * * * If the activities of these appellants were deemed to be the doing of business, then the doing of business would comprise every instance where property is owned in common and the owners act but to safeguard their property. If there is to be maintained a distinction between ownership on the one hand and the doing of *310 business on the other, a distinction established by the cases, and respondents do not suggest that the distinction be obliterated, then these appellants may not be regarded as having been engaged in the doing of business.”
The Nauss case (supra) is not controlling for at least two reasons. First, Mr. Steinbeck is not a mere passive owner or investor. He actively creates the literary properties which bear his name. Second, and more important, or so it seems to us, the statute presently under consideration is considerably broader in its terms than the statute in the Nauss case. The only word in issue in the Nauss case was “ business ” as it appeared in the context of an unincorporated business tax statute. The issue in this ease is not only whether petitioner is engaged in any ‘ ‘ business ’ ’ as that word appears in the context of a gross receipts tax statute, but also whether he is engaged in any “trade”, “vocation”, “profession” or “commercial activity ” as those words appear in the context of such a statute — a statute which was intended to be so broad in its operation that the lawmakers felt obliged to declare that the statute “ [d]oes not include labor or services rendered by an individual for a wage or salary.” (Administrative Code, § B46-1.0, subd.-5.)
Petitioner emphasizes that his receipts in any one taxable calendar year are attributable to contracts made in prior taxable years. The intimation is that these receipts were not taxable at all. Petitioner bases his argument on the wording of the statute which measures the tax by the “ receipts received in and/or allocable to the city from such profession, vocation, trade, business or commercial activity exercised or carried on by him during the calendar year ’ ’ in which the privilege period commences (Administrative Code, § B46-2.0, subd. a). Petitioner urges that in order for the receipts to be taxable in any calendar year they must not only be received in that year but they must be derived from a “particular activity” carried on in that year. By 1 ‘ particular activity ’ ’, petitioner seems to refer to the making of the contract which gave rise to the receipts. The statute, however, merely requires that the receipts be attributable to the profession, vocation, trade, business, or commercial activity which the petitioner carried on in that year and not to any ‘1 particular activity. ’ ’ The receipt of income is as much *311 part of a business as the making of a contract that gives rise to such income.
That brings us to the principal question in the case, which is, “ Does the constitutional guarantee of freedom of the press prohibit the City of New York from imposing a gross receipts tax on the receipts of an author derived from the grant of licenses to his rights in his literary works 1 ”
The G-ross Receipts Tax is expressly declared to be a privilege tax (Administrative Code, ch. 46, tit. B; Matter of United Air Lines v. Joseph, 282 App. Div. 48, 55, affd. 307 N. Y. 762). Petitioner does not contend that he is exempt from the general run of taxes. His contention is that his activities as an author are exempt from this form of taxation and that a privilege tax levied upon his activities impinges on the right of free press reserved to him by the United States and New York Constitutions and, so, is totally invalid. To sustain his position he refers us to the cases of Grosjean v. American Press Co. (297 U. S. 233 [1936]); Follett v. McCormick (321 U. S. 573 [1944]); Murdock v. Pennsylvania (319 U. S. 105 [1943]), and Jones v. Opelika (319 U. S. 103 [1943]).
The Supreme Court of New Jersey has aptly summarized the Grosjean case {supra) in these words: “In the Grosjean case * * * the court dealt with an infamous attempt to control Louisiana newspapers by the imposition of a gross receipts license tax on newspapers having a circulation of more than 20,000 copies per week. [There were 13 newspapers in Louisiana which had a circulation of more than 20,000 copies per week. There were 4 other daily newspapers each having a circulation of “ slightly ” less than 20,000 copies per week which were in competition with the larger newspapers and 120 weekly newspapers also in competition “ to a greater or lesser degree ’ ’ with the larger daily newspapers.] The court struck it down stating that although newspapers were not immune from ordinary forms of taxation, this was ‘ not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press.’ ” (City of Absecon v. Vettese, 13 N. J. 581, 585-586.) In writing the opinion of this court in Matter of Business Statistics v. Joseph (299 N. Y. 443, 453, supra), I made a comment similar to that of the New Jersey court concerning *312 the Grosjean case, to wit, “ There, as stated in Mabee v. White Plains Pub. Co. (327 U. S. 178, 184) ‘ * * * the press was singled ont for special taxation and the tax was graduated in accordance with volume of circulation. ’ ’ ’ The inapplicability of the Grosjean case to the present ease is best illustrated, however, by the following language from the Supreme Court opinion in that case:
“ * * * The tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties.
“ * * * The form in which the tax is imposed is in itself suspicious. It is not measured or limited by the volume of advertisements. It is measured alone by the extent of the circulation of the publication in which the advertisements are carried, with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers. * * * ” (297 U. S. 250-251.)
In the Murdock, Jones and Follett cases (supra) the Supreme Court of the United States held that a municipal ordinance which, as construed and applied, required religious colporteurs to pay a license tax as a condition to the pursuit of their activities, was invalid under the Federal Constitution as a denial of freedom of speech, press and religion. In the course of the opinions in the Murdoch and Follett cases the court used broad language (relied on by petitioner Steinbeck) suggesting that license taxes may never be imposed for the exercise of constitutional privileges such as freedom of worship, speech and press. For example, it was said:
“ Freedom of press, freedom of speech, freedom of religion are in a preferred position ” (Murdock v. Pennsylvania, supra, p. 115).
“ * * * a tax laid specifically on the exercise of those freedoms would be unconstitutional ” (Murdock v. Pennsylvania, supra, p. 108).
“ The exaction of a tax as a condition to the exercise of the *313 great liberties guaranteed by the First Amendment is * * * obnoxious ” (Follett v. McCormick, supra, p. 577).
While such language has caused some uncertainty concerning the full scope of those three cases involving itinerant preachers, it seems clear from subsequent events that there is no serious constitutional objection to a tax law such as the Mew York City Gross Receipts Tax. In Tampa Times Co. v. City of Tampa (158 Fla. 589) the Supreme Court of Florida upheld a privilege tax, measured by gross receipts, on all wholesale and retail sellers of newspapers, magazines and periodicals published within the city of Tampa. Appeals taken to the Supreme Court were “ dismissed for want of a substantial federal question.” (332 U. S. 749 [1947].) We are told that a dismissal “ for the want of a substantial federal question ”, as distinguished from a denial of certiorari, is a decision on the merits and has the force of precedent (Frankfurter and Hart, The Business of the Supreme Court at October Term, 1934, 49 Harv. L. Rev. 68, 77).
Much that was said by the Supreme Court of Florida in the Tampa Times case (supra) bears repetition here. We will content ourselves with the following excerpts (158 Fla. 592-594):
‘ ‘ The ordinance in question is for revenue. There is no claim that it is arbitrary or harsh in nature. The single question then’ is whether a newspaper is immune from the burden of taxation to maintain government. * * *
“ Freedom of the press is almost as old as printing. It, like its older brother freedom of speech, is indispensable to free government. We cannot circumscribe or define it, yet great scholars and jurists have filled libraries with dissertations thereon. Freedom of the press is, in truth, an ideal to which all lovers of liberty may strive in order to maintain free government in an ever changing society. Its importance cannot be magnified too much. It is not enough to say that freedom of the press is a cornerstone of free government. It is, in fact, a prerequisite to free government. Yet; in view of all that, it is no governmental functionary. It exercises no governmental power * * * neither does it interpret, administer or enforce any although it may wield a great influence on all. It is clothed with no power to rule, yet it is and must remain a free institution. The press renders a public service although it is a private business which *314 can only endure under the protection of free government. It may invoke constitutional protection in common with others. Government possesses power whereas the press wields influence. A free government and a free press are essential for either to survive. Government is charged with the duty of protecting the rights and liberties of all its citizens including 1 the press.’
“ A government must have revenue. It is not a producer. Its income must be derived by taxation in one form or another. Admittedly a tax, in any form or guise, is a burden yet that alone does not impair freedom of the press any more than an income or ad valorem tax will destroy freedom of speech to any other citizen. Many states rely entirely on ad valorem taxes for revenue. We have no knowledge of any case where a newspaper has been held immune from all forms of taxation. A state may choose to substitute a gross sales tax but in that case the relative burden on a newspaper would not be changed. In this case the City of Tampa has enacted a gross sales tax. Its application is general. The tax enacted is reasonable and its terms are not arbitrary.”
In City of Corona v. Corona Daily Independent (115 Cal. App. 2d 382) the District Court of Appeal, Fourth District, California, upheld a flat license tax imposed by ordinance upon the doing of business within the city, including that of publishing a newspaper. After considering the Murdock case and other pertinent authorities, that court concluded that there was no constitutional inhibition against the tax. Among other things, that court wrote:
‘ ‘ The phrase ‘ power to tax is the power to destroy ’ is without application to the issue here presented. There is no allegation or showing by defendant that the amount levied was arbitrary or harsh in nature, or oppressive or confiscatory, or that defendant’s freedom to disseminate news and comment has been actually curtailed or abridged by the requirement that it shall pay a tax of $8.00 per quarter for publishing its newspaper. Nor is there any showing that the imposition of the tax was for the purpose of regulating defendant’s business.
“ While the ordinary business tax here in issue is levied in form upon the privilege of engaging in or transacting business, it is, on its face and in fact, a tax for revenue purposes only, and does not grant or take away any right to do business, does not *315 subject business to withdrawal or control by the city, is not regulatory in any manner, and in substance has been recognized and upheld by the weight of authority.
“We conclude that a nondiscriminatory tax, levied upon the doing of business, for the sole purpose of maintaining the municipal government, without whose municipal services and protection the press could neither exist nor function, must be sustained as being within the purview and necessary implications of the Constitution and its amendments.” (115 Cal. App. 2d 389-390.)
The Supreme Court of the United States denied certiorari (346 U. S. 833). Justices Black and Douglas dissented, stating, inter alia, that1‘ The license tax involved here is a privilege tax in fact as well as in form — ‘ a flat tax imposed on the exercise of a privilege granted by the Bill of Rights. ’ (319 U. S. at p. 113.) No government can exact a price for the exercise of a privilege which the Constitution guarantees.”
In the light of all the foregoing, we are persuaded that the City of New York may constitutionally impose the Gross Receipts Tax upon petitioner Steinbeck. The tax applies not only to writers and publishers but to all businesses, professions, trades, vocations and commercial activities. It is measured by gross receipts and applies to all without discrimination. No tax is due and no return need be filed unless and until the gross receipts exceed $10,000 per annum. Thus, it is a general tax and one which is not, in any sense, aimed at the press or at writers. The city does not seek, through the guise of the Gross Receipts Tax, to regulate those covered by its provisions or, more particularly, to restrain or interfere with freedom of the press. Its sole object is revenue notwithstanding the fact that the tax is styled a “ privilege tax.” The Gross Receipts Tax is, like any tax, a burden. Nevertheless, it does not impair Mr. Steinbeck’s right of freedom of the press any more than an income tax impairs such right. “The guaranties of the Constitution and Bill of Rights in favor of the freedom of the press, freedom of speech, and personal liberty, were never intended to restrict the right of taxation for the support of the government. If these guaranties did restrict the power of taxation, the government would soon be insolvent, and powerless to furnish the protection claimed.” (City of Norfolk v. Norfolk Landmark Pub. Co., 95 Va. 564, 565.)
*316 There is no claim and no showing by petitioner that the amount levied was arbitrary or harsh in nature, or oppressive or confiscatory, or that his freedom to write or disseminate his writings has been actually curtailed by the tax. What is more, petitioner has failed to demonstrate that the tax was imposed for the purpose of regulating his writing.
Petitioner next asserts that he is entitled to an allocation of tax even if the tax as applied to him is constitutionally valid. He contends that an allocation is required because part of the activity which gives rise to his receipts consists of the exercise of a constitutionally protected privilege, viz., ‘ ‘ the creative activity of writing ”, Petitioner maintains that the “ City must provide a basis for allocating to the creative activity of writing, constitutionally protected, a reasonable portion of the royalties earned by the appellant.” There is no merit to this argument which, it will be observed, is, in reality, but a restatement of his principal argument that a privilege tax cannot be levied upon a writer at all. If petitioner were correct, it would be difficult to conceive of any business which would not be entitled to a similar allocation, since hardly any business can be carried on without speech or writing. However, no such suggestion is to be found in any of the cases. Indeed, the decisions involving the application of a privilege tax to newspapers stand for the proposition that the exercise of freedom of the press does not grant immunity from general taxation, not for the proposition that only selected incidents unconnected with such exercise may be taxed. The totality is subject to tax.
Mr. Steinbeck’s final contention is that even if he is not totally exempt from the privilege tax, the city cannot reach royalties paid to him for his consent to sales and performances of his work in interstate and foreign commerce. The claim is that the grant of consent — the license to publish — constituted the commencement of or induced interstate commerce.
The contracts for licenses of petitioner’s rights in his novels, plays and motion picture scripts call for the payment of a lump sum or a percentage or a combination of the two. The percentage payment, commonly referred to as ‘ ‘ royalties ’ ’, is made by the publisher on the basis of the number of copies that the publisher has sold. While many of the sales may have been made by the publisher in other States and other countries, and it may be that *317 the publisher was engaged in interstate and foreign commerce as a result, it does not necessarily follow that petitioner was likewise engaged in interstate and foreign commerce. The relationship between Mr. Steinbeck and his publishers was that of debtor and creditor — not that of joint venturers (cf. Broadcast Music v. Taylor, 10 Misc 2d 9). Petitioner received no property rights in the books or magazines sold by the publishers nor in the films made by the motion picture companies. It is true that the word “royalty” is defined generally as a share of the profits reserved to the owner for permitting another to use his property (see 77 C. J. S., Royalty or Royalties, pp. 542-543) and that the sharing of profits is an element of a joint venture arrangement. However, there was to be no sharing of losses. For example, petitioner was to receive a percentage of the amount charged by the publisher for all copies sold, less copies returned, but with ‘ ‘ no deduction for cash discounts or bad debts.” An indispensable essential of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of mahing good the losses. Reynolds v. Searle, 186 App. Div. 202, 203.) An agreement to distribute the proceeds of an enterprise upon a percentage basis does not give rise to a joint venture if the enterprise does not represent a joinder of property, skills and risks (Gordon Co. v. Garcia Sugars Corp., 241 App. Div. 155). “The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit * * (Hasday v. Barocas, 10 Misc 2d 22, 28.) The present case does not reveal such an amalgam of property or interests as would create a joint venture. No one can deny that petitioner and the publishers had a community of interest and a common economic objective. However that may be, it is not “ enough that two parties have agreed together to act in concert to achieve some stated economic objective. Such agreement, by itself, creates no more than a contractual obligation, otherwise every stockholders’ agreement *318 would give rise to a joint venture. The fiduciary obligation arises upon the coagulation of property, profits or other interests which the parties can then be said to hold jointly and which are made accessible to each other in terms of the confidential relationship which exists between joint associates.” (Id., pp. 28-29.)
The sums payable to petitioner by way of royalties were merely the price for the licensing of certain of his literary rights. The sales made by the publishers and the gross receipts from the motion pictures were simply the means by which the price for the licensing of Mr. Steinbeck’s literary rights were ultimately to be determined. The relationship between an author and a publisher is not that of joint venturers merely because the publisher is to pay the author on the basis of receipts from the sale of books. On the contrary, it must be said that the source of Mr. Steinbeck’s income was not the sales made by the publisher, but the contracts made between him and his publisher in New York City (see Ingram v. Bowers, 57 F. 2d 65).
Petitioner makes the further argument that his activities are so closely related to interstate commerce and foreign commerce that they must be treated as though they were activities in interstate or foreign commerce.
The commerce clause of the Constitution of the United States (U. S. Const., art. I, § 8) expressly commits to Congress and impliedly withholds from the several States the power to regulate commerce among the States and with foreign nations. Foreign commerce, as well as interstate commerce, is governed by the commerce clause, and the same principles govern both (Joseph v. Carter & Weekes Co., 330 U. S. 422, 425). The purpose of the commerce clause is to protect commercial intercourse from invidious restraints, to prevent interference through conflicting or hostile State laws, and to insure uniformity in regulation (11 Am. Jur., Commerce, § 2). Although the term “ commerce ” is employed in the Constitution it is not defined therein and it has been said that the term is not susceptible of exact and comprehensive definition (id., § 3). However, it is no longer open to question that the formation of a contract between persons in different States is not within the protection of the commerce clause unless the performance thereof is within its protection (Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 253; see, also, Matter of New Yorker Mag. v. Gerosa, 3 N Y 2d *319 362, appeal dismissed by the Supreme Court of the United States on April 28, 1958, 356 U. S. 339). “ Nor is taxation of a local business or occupation which is separate and distinct from the transportation and intercourse which is interstate commerce forbidden merely because in the ordinary course such transportation is induced or occasioned by the business.” (Western Live Stock v. Bureau of Revenue, supra, p. 253.) In Ficklen v. Shelby County Taxing Dist. (145 U. S. 1, 24) the Supreme Court of the United States sustained a license tax measured by a percentage of the gross annual commissions received by brokers engaged in negotiating sales within the State of Tennessee for sellers without the State. In so doing, the court said: “ This tax is not on the goods, or on the proceeds of the goods, nor is it a tax on non-resident merchants; and if it can be said to affect interstate commerce in any way it is incidentally, and so remotely as not to amount to a regulation of such commerce.” In our judgment, the quoted language from the foregoing cases is applicable here. The writing by Mr. Steinbeck of books, plays, magazine articles, motion picture scripts and radio scripts, and the granting, within the city of New York, of licenses to certain of the rights therein is separate and distinct from the subsequent sale by others of books, magazines, etc., in interstate or foreign commerce even though the granting of the licenses may induce or occasion interstate commerce. The most Mr. Steinbeck can claim is that his receipts, insofar as their measure was based on the amount of subsequent interstate or foreign sales by other persons of books published by such other persons, are traceable to such interstate or foreign sales. That does not bring him within the coverage of the commerce clause. In the Western Live Stock case (303 U. S. 250, supra) the Supreme Court noted, as one reason for upholding the statute there under consideration, that a tax on the taxpayer’s activity could not be levied elsewhere than in New Mexico where the taxpayer prepared, printed and published a magazine (the magazine was circulated within and without the State of New Mexico). Here, as in that case, a tax on Mr. Steinbeck’s activities cannot be levied elsewhere than in New York. In the words of the Ficklen case (145 U. S. 1, 24, supra), “ This tax is not on the goods, or on the proceeds of the goods, nor is it a tax on non-resident merchants; and if it can be said to affect interstate commerce in *320 any way it is incidentally, and so remotely as not to amount to a regulation of such commerce.”
The order of the Appellate Division should be affirmed, with costs. -•
Judges Desmond, Dye, Fuld, Fboessel, Van Voorhis and Burke concur.
Order affirmed.