**NATIONAL BANK AND TRUST COMPANY OF NORTH AMERICA, LTD., Plaintiff,**

v.

**J. L. M. INTERNATIONAL, INC., et al., Defendants.**

No. 76 Civ. 1493 (GLG).

United States District Court, S. D. New York.

Oct. 18, 1976.

As Amended Dec. 20, 1976.

Finley, Kumble, Wagner, Heine, Underberg & Grutman, New York City, for plaintiff; Norman R. Grutman, Richard A. Rubin, and Jeffrey Daichman, New York City, of counsel.

Wien, Lane & Malkin, New York City, for defendant, J. L. M. International, Inc.; Robert G. Desmond, New York City, of counsel.

Kissam & Halpin, New York City, for defendants, Federal Republic of Nigeria Central Bank of Nigeria; James G. Simms, New York City, of counsel.

McHugh, Heckman, Smith & Leonard, New York City, for defendant, Interexporte, S.A.R.L.; Martin J. McHugh, Robert P. Whelan, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

This action results from a complex series of international commercial and financial transactions arising from an apparent attempt by Nigeria to corner the world's cement market. Following is a brief recitation of the relevant facts.[1] On March 1, 1975, an agreement was reached by which the Federal Republic of Nigeria promised to purchase from J.L.M. International, Inc. ("J.L.M."), a Massachusetts corporation, 240,000 metric tons of cement at $60 per metric ton "C.I.F. Lagos" for a total of $14,400,000. The contract provided, *inter alia*, that Nigeria would cause a letter of credit to be issued in favor of J.L.M. to insure payment of the cement as well as all shipping and demurrage charges (the latter being computed at a rate of $4,100 per day). About April 3, 1975, the Central Bank of Nigeria ("Central Bank") confirmed a prior communication it had sent to Morgan Guaranty Company of New York City ("Morgan") instructing Morgan to open an *irrevocable*, transferable "Documentary Credit" in favor of J.L.M. in the amount of $14,400,000 to be paid against sight drafts from 100% of the C.I.F. invoices drawn on Morgan. This confirmation incorporated *verbatim* the material terms of the cement contract (including demurrage).[2] On April 17, 1975, Morgan advised J.L.M. by letter that a $14,400,000 *irrevocable* letter of credit (#CBN/BO/75/50) had been established in its favor, such letter also repeating *verba-*

---

1. Several sources for this information have been used including a second affidavit submitted by the plaintiffs. The defendants contend that this document is not properly before the Court because it contains allegations not included in the original application for a provisional order of attachment. However, on a motion to prove an attachment under § 6223 of the Civil Practice Laws and Rules of New York it is expressly provided that "the court shall give the plaintiff a reasonable opportunity to correct any defect." The official commentary explains that "[a]ny defect in the papers submitted for a provisional remedy may be cured by amendment . . .." *Id.* (at Supp.Prac. Comm.) p. 51. This Court can, in its discretion, consider the averments contained in the latter affidavit.

2. Defendants Nigeria and Central Bank of Nigeria have urged the application of the doctrine of sovereign immunity as a defense to this action. On the facts presented and considering the nature of the action and its in rem jurisdictional basis, this defense is inappropriate. *Victory Transport, Inc. v. Comisaria General*, 336 F.2d 354, 357 (2d Cir. 1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965); *Amkor Corporation v. Bank of Korea*, 298 F.Supp. 143 (S.D.N.Y.1969); *Pan American Tankers Corp. v. Republic of Vietnam*, 296 F.Supp. 361 (S.D.N.Y.1969); *J. Zeevi & Sons v. Grindlays Bank (Uganda)*, 37 N.Y.2d 220, 226, 371 N.Y.S.2d 892, 897, *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). The U. S. Department of State has not filed a suggestion of sovereign immunity.

*tim* the material contractual terms (including demurrage) and stating that the credit could properly be transferred to other transferees and beneficiaries.

Assured by these financing arrangements J.L.M. contracted with Interexporte, S.A. R.L. ("Interexporte"), a Portuguese company, for the delivery of the specified cement to Lagos, Nigeria, by Interexporte in exchange for the payment of $11,280,000 by J.L.M.. About June 17, 1975, Morgan advised Interexporte that, in accordance with the instructions of J.L.M., $11,280,000 had been transferred from the letter of credit at Morgan and would be paid to Interexporte upon presentment of the specified sight drafts to Morgan. Consequently, on June 19, 1975, Interexporte entered into a charter party agreement with Fletamentos Macia, S.A., ("Macia"), of Barcelona, Spain, whereby Macia agreed to transport 180,000 metric tons of cement with a "firm option" for the transporting of another 60,000 tons.

Under this agreement Macia was allowed to use either its own vessels or Macia could charter vessels to effect the transportation. The latter possibility was chosen. Macia was unable on its own to obtain the financial guaranties necessary in order to secure shipping commitments with the vessel owners. As a result Macia contracted with the plaintiff, National Bank and Trust Company of North America, Ltd., ("Natbank"), a corporation incorporated under the laws of the British West Indies, to arrange such guaranties in favor of the owners of two vessels. Natbank pledged its credit and, on August 17, 1975, Macia and Natbank entered into a "joint venture" agreement regarding the entire transaction with Interexporte. Specifically they agreed, *inter alia*, that Natbank would pay all costs and be the transferee of all income (expressly including a reference to funds from Morgan).[3]

Based upon this contractually assumed commitment Natbank paid $1,278,710 in satisfaction of claims made by the vessel owners.

On September 30, 1975, Morgan posted notification to Interexporte that Nigeria had amended its letter of credit (#CBN/BO/75/50) so as to impose the added requirement that demurrage payments would not be made unless the documents specified in the original credit were from that time on certified for payment by Central Bank. This action was apparently taken unilaterally without the consent of the other parties to the irrevocable letter of credit. The defendants have refused to make payment for the demurrage charges. (J.L.M. and Interexporte have not sued for the cost of the cement, presumably because it has not yet been "delivered.")

On March 30, 1976, this action was instituted by a complaint filed with this Court, subject matter jurisdiction being based upon diversity of citizenship. 28 U.S.C.A. § 1332. Personal jurisdiction was based upon a provisional order of attachment issued by District Judge Edward Weinfeld on March 31, 1976, pursuant to Rule 64 of the Federal Rules of Civil Procedure and Section 6201(1) of the Civil Practice Laws and Rules of New York. The present motion to prove the grounds upon which the order of attachment was issued has been brought by the plaintiff, Natbank, in compliance with the provisional order of Judge Weinfeld.[4]

It is clear, and on this point even the parties to this hotly contested litigation agree, that the law of the State of New York governs the issue of proving the grounds for the attachment. Fed.Rules Civ.Proc. rules 4(e) and 64. *See J. Zeevi & Sons v. Grindlays Bank (Uganda),* 37 N.Y.2d 220, 371 N.Y.S.2d 892, *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95

---

3. The contract acknowledges that Natbank "was the principal party with respect to the drawing up and execution of the Charter Party between . . ." Interexporte and Macia.

4. Notwithstanding plaintiff's arguments to the effect that the decision of the Supreme Court on March 24, 1976, in *Curtis Circulation Co. v.*

*Sugar,* 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976), serves to relieve it of its burden of going forward with the instant motion, the unequivocal language of Judge Weinfeld's order required that the plaintiff prove the grounds upon which the order of attachment was issued.

(1975). Thus it is incumbent upon the plaintiff to prove a *prima facie* case in support of the complaint upon which the attachment is based. CPLR § 6212(a). *See* 7A Weinstein, Korn, Miller, New York Civil Practice, ¶ 6212.02 (Rev. 1975). It has been held, however, that in determining whether this burden has been sustained "the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the stated facts." *Marklin v. Drew Properties Corp.,* 280 F.Supp. 176, 179 (S.D. N.Y.1967), quoting with approval *Cocoline Chocolate Co. v. Hillside Enterprises, Inc.,* 45 Misc.2d 594, 596, 257 N.Y.S.2d 444, 446 (Sup.Ct. Kings Co. 1965). *See also United States v. Brown,* 247 N.Y. 211, 160 N.E. 13 (1928); *Maw v. Butler and Smith, Inc.,* 226 N.Y.S.2d 649 (Mun.Ct. 1st Dep. 1962); *United Steel Warehouse Corp. v. Del-Penn Steel Company,* 212 N.Y.S.2d 157 (Sup.Ct. Kings Co. 1961); *Ecco High Frequency Corp. v. Amtorg Trading Corp.,* 81 N.Y.S.2d 610, 612 (Sup.Ct. N.Y.Co. 1948). It is also well settled in New York attachment proceedings that the court should not attempt to decide the merits of the case in advance of trial "[unless] the complaints and affidavits . . . clearly indicate that the plaintiffs must ultimately fail." *Wulfsohn v. Russian Socialist Federated Soviet Republic,* 234 N.Y. 372, 377, 138 N.E. 24 (1923); *Bard-Parker Co. v. Dictograph Products Co.,* 258 App.Div. 638, 17 N.Y.S.2d 588 (1st Dept. 1940); *Maw v. Butler and Smith, Inc., supra; Marklin v. Drew Properties Corp., supra; Cocoline Chocolate Co. v. Hillside Enterprises, Inc., supra; Nicolich v. E. Muniz Ferreira & C.I.A.,* 149 N.Y.S.2d 662, 664 (Sup.Ct. Kings Co. 1956); *Katz v. Liston,* 22 A.D.2d 205, 254 N.Y.S.2d 389, 390 (1st Dep. 1964).

In approaching this complicated problem it is necessary to begin by tracing this maze of international transactions back to its inception to determine whether the plaintiff has a matured cause of action. The letter of credit between the Nigerian defendants and J.L.M. is expressly designed to be *irrevocable.* Under the Uniform Commercial Code, ". . . once an irrevocable credit is established as regards . . . the beneficiary it can be modified or revoked only with his consent." Uniform Commercial Code, § 5–106(2) [in pertinent part]; *Dulien Steel Products, Inc. of Wash. v. Bankers Trust Co.,* 189 F.Supp. 922, 927 (S.D.N.Y. 1960); *Lamborn v. National Park Bank,* 240 N.Y. 520, 148 N.E. 664, 148 N.E. 664 (1925). *See generally* Uniform Customs and Practice for Documentary Credits, Art. 3; Ward & Harfield, *Bank Credits and Acceptances* (Ronald Press, 4th ed., 1958), p. 15. In the instant case the terms of the original letter of credit were modified (*to wit,* a requirement of certification of certain documents by Central Bank as a condition precedent to presentment regarding payment for demurrage charges was added) without the consent of the beneficiary, J.L.M. *See id.* at § 5–103(1)(d). This unilateral amendment of the terms of the credit amounted to a repudiation of the credit giving "the beneficiary . . . the rights of a seller after anticipatory repudiation by the buyer . . . ."[5] *Id.* at § 5–115(2). *See J. Zeevi & Sons v. Grindlays Bank (Uganda), supra,* 37 N.Y.2d at 227, 371 N.Y.S.2d at 898 (and cases cited therein). This approach is in harmony with Article 3 of the Uniform Customs and Practice for Commercial Documentary Credits. Uniform Commercial Code, § 5–106 (Practice Comm.) at p. 661. Therefore, J.L.M. has an existing cause of action against the Nigerian defendants for breach of the original terms of their irrevocable letter of credit.

Under its original terms the credit was expressly made "transferable to second beneficiaries. . . ." Under the Code,

---

**5.** Assuming, *arguendo,* that the procedural mechanism of anticipatory repudiation has been triggered only as to the credit's provision for payment of demurrage costs, and not as a breach of the whole credit, the damages are still substantial. Both ships in question arrived at Lagos more than one year ago; computing demurrage at the agreed upon rate of $4,100 per day suggests damages on that aspect alone of approximately three million dollars. Although complex problems are involved regarding damages, *see e. g.,* Uniform Commercial Code, § 2–610, the scope of review at this stage is limited to the question of whether there occurred an anticipatory breach precipitating an immediate cause of action by the plaintiff.

therefore, J.L.M.'s transfer of $11,280,000 from the credit to Interexporte is ostensibly valid and enforceable. *Id.* at 5–116(1). See Uniform Customs and Practice for Documentary Credits, Art. 46. Consequently, this clothes Interexporte with the same immediate cause of action based on the anticipatory repudiation of the letter of credit. The rights of the plaintiff vis-à-vis these parties to the credit must now be examined.

▆ As stated previously, the plaintiff, Natbank, entered into a joint venture agreement with Macia regarding the charter party agreement with Interexporte.[6] The contract provided that the parties would share equally in the profits and losses of these charter operations, such a condition being indispensable in a valid joint venture agreement. *Steinbeck v. Gerosa,* 4 N.Y.2d 302, 175 N.Y.S.2d 1, 151 N.E.2d 170, *app. dism.,* 358 U.S. 39, 79 S.Ct. 64, 3 L.Ed.2d 45 (1958); *Bennett v. Pierce Industries, Inc.,* 28 A.D.2d 944, 281 N.Y.S.2d 674 (3rd Dep. 1967). Furthermore, since all payments and income are to flow through it, Natbank is an appropriate party to bring an action on behalf of the joint venturers.[7] The crucial link in this chain must now be considered, the aspect upon which all else hinges—whether the funds at Morgan Guaranty Trust are properly attachable by Natbank.

Under the Civil Practice Laws and Rules of New York "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment." CPLR § 6202 [in pertinent part]. Section 5201 provides, in pertinent part:

A money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor, whether it was incurred within or without the state, to or from a resident or non-resident . . . .. A debt may consist of a cause of action which could be assigned or transferred accruing within or without the state.

*Id.* at § 5201(a) [in pertinent part]. Since there is no statutory definition for "debt" as it is used in this context, reference must be made to the decisional law of New York for guidance.[8]

▆ It has been recognized, ever since the landmark decision of the Supreme Court in *Harris v. Balk,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1904), that a contract may give rise to a debt so as to be subject to attachment. In *Harris* the party moving for the attachment was able to serve the writ personally within the state in which the action was commenced on the nonresident whose debt was to be attached. In upholding this procedure the Court explained that "[t]he obligation of the debtor to pay his debt clings to and accompanies him wherever he goes. . . . It is nothing but the obligation to pay which is garnished or attached." *Id.* at 222–23, 25 S.Ct. at 626. *Harris* was decided in a commercially primitive era, however. Extending this basic premise so that it applies in today's complex socio-economic system has produced significant differences among the courts of the various states. What is an appropriate extension in a financially sophisticated area like New York City would be illogical in rural areas. For purposes of this litigation this Court must apply the law of New York.

Although it has been seriously criticized, *see, e. g., Javorek v. Superior Court of Monterey County,* 17 Cal.3d 629, 131 Cal. Rptr. 768, 552 P.2d 728 (Cal.Supreme Ct.,

---

6. As to the concept of "joint venture" generally, see *Blair v. Scimone,* 26 A.D.2d 751, 272 N.Y.S.2d 75 (3rd Dep. 1966); *Masterson v. Valley Nat. Bank of Long Island,* 70 Misc.2d 623, 334 N.Y.S.2d 356 (Sup.Ct. Nassau Co. 1972); *Nager Elec. Co. v. Office of General Services,* 56 Misc.2d 975, 290 N.Y.S.2d 943 (Sup.Ct. Albany Co. 1967), *aff'd,* 30 A.D.2d 626, 290 N.Y. S.2d 947 (3rd Dep. 1968).

7. It is not necessary at this time to consider whether Macia must be joined as a party plaintiff in this action. *See generally* Williston on Contracts, Third Edition § 326.

8. This attachment provision requires the existence of a "debt certain." *See generally* Weinstein, Korn, Miller, 7A Civil Practice ¶ 6202.04. This requirement is satisfied here by the remedial provisions of the Code. Uniform Commercial Code, §§ 5–115(2), 2–610.

1976), the controlling law regarding attachments in New York is found in *Seider v. Roth,* 17 N.Y.2d 111, 269 N.Y.S.2d 99, 216 N.E.2d 312 (1966). The Court of Appeals there held that a provision in a policy of automobile liability, whereby the insurer was obligated to defend and indemnify the insured, rendered this contractual obligation of the insurer a "debt" within the meaning of the state attachment statute. In *Seider* the plaintiffs, New York residents, were injured in an accident occurring in Vermont through the negligence of a Canadian driver. The liability policy was issued in Canada by a company doing business in New York State. In upholding the denial by the lower courts of the motion to vacate the attachment, the Court of Appeals stated:

> It is said that by affirmance we would be setting up a "direct action" against the insurer. That is true to the extent only that affirmance will put jurisdiction in New York State and require that insurer to defend here, not because a debt owing by it to the defendant has been attached but because by its policy it has agreed to defend in any place where jurisdiction is obtained against its insured. Jurisdiction is properly acquired by this attachment since the policy obligation is a debt owed to the defendant by the insurer, the latter being regarded as a resident of this state . . . . .

*Id.* at 114, 269 N.Y.S.2d at 102, 216 N.E.2d at 315.

The *Seider* doctrine was reaffirmed by that court in *Simpson v. Loehmann,* 21 N.Y.2d 305, 287 N.Y.S.2d 633, 234 N.E.2d 669 (1967), a case involving a similar fact pattern with the liability policy issued by a Pennsylvania corporation. The *Simpson* holding was said to turn "on whether the obligation of the insurer, doing business in New York, to defend and indemnify the insured (under its policy) enables the New York courts to exercise jurisdiction in rem over him." *Id.* at 309, 287 N.Y.S.2d at 635, 234 N.E.2d at 670. In upholding this exercise of jurisdiction the Court of Appeals

focused directly on the issue upon which the present case hinges—the adequacy of the nexus between the "debt", the state and the defendants:

> [T]he presence of that debt in this State . . . .—contingent or inchoate though it may be—represents sufficient of a property right in the defendant to furnish the nexus with, and the interest in, New York to empower its courts to exercise an in rem jurisdiction over him.

> \* \* \* \* \* \*

> The historical limitations on both in personam and in rem jurisdiction, with their rigid tests, are giving way to a more realistic and reasonable evaluation of the respective rights of plaintiffs, defendants and the State in terms of fairness. . . . Such an evaluation requires a practical appraisal of the situation of the various parties rather than an emphasis upon somewhat magical and medieval concepts of presence and power.

*Id.* at 310–11, 287 N.Y.S.2d at 636, 234 N.E.2d at 671 [citations omitted]. Although there were different policy considerations present in *Seider* and *Simpson* from those which exist here (*e. g.,* insurance versus letters of credit), this language serves as an articulation of the general standards to be applied in New York attachment situations. *See* Business Corporation Law § 1314 (Supp.1965).

Last year in a case with facts similar to those presently before this Court, *J. Zeevi & Sons v. Grindlays Bank (Uganda), supra,* the New York Court of Appeals discussed at length the significance of letters of credit to New York in its international commercial transactions:

> The value to those in commerce of having a place at a financial capital where funds can be obtained on a simple letter of credit, away from a relatively small bank in an undeveloped country of uncertain political stability, is obvious.

> \* \* \* \* \* \*

New York has an overriding and paramount interest in the outcome of this

litigation. It is a financial capital of the world, serving as an international clearinghouse and market place for a plethora of international transactions, such as to be so recognized by our decisional law . . . . A vast amount of international letter of credit business is customarily handled by certain New York banks whose facilities and foreign connections are particularly adaptable to this field of operation . . . . The parties, by listing United States dollars as the form of payment, impliedly accepted these facts and set up procedures to implement their trust in our policies. In order to maintain its preeminent financial position, it is important that the justified expectations of the parties to the contract be protected

. . . .

37 N.Y.2d at 226–27, 371 N.Y.S.2d at 898 [citations omitted]. The adoption of these policy considerations to the present case serves to provide Natbank with a forum for a fair determination of its claims produced by the anticipatory repudiation of financial assurances upon which it relied to its detriment. Having availed itself of the aura of stability attendant to commercial dealings transacted with New York financial institutions, the defendants may not now successfully avoid the consequences of their misconduct.

For the reasons stated above the plaintiff has sustained its burden of proving the order of attachment and, consequently, that order shall remain in effect until a final determination of the action.

SO ORDERED.