DINACO, INC., Plaintiff–Appellant,

v.

TIME WARNER, INC., Time Inc., TLPI Co., Time Life Inc., individually d/b/a/ Time Life Medical and Time Publishing Ventures, Inc., Defendants–Appellees,

LIFE, INC., Defendant.

Docket No. 02–9396.

United States Court of Appeals, Second Circuit.

Argued: Aug. 28, 2003.

Decided: Sept. 29, 2003.

Amended: Oct. 2, 2003.

Jack Gross (of Counsel), Goldberg & Associates, New York, NY, for Plaintiff–Appellant.

David W. Dykhouse, Patterson, Belknap, Webb & Tyler, LLP (Milton L. Williams Jr., of Counsel, Jon–Peter F. Kelly, Rosa E. Son, on the brief), New York, NY, for Defendants–Appellees.

Before: MINER, STRAUB, and WESLEY, Circuit Judges.

WESLEY, Circuit Judge.

Plaintiff–Appellant Dinaco Inc. ("Dinaco") appeals from the October 28, 2002 judgment of the United States District Court for the Southern District of New York (John S. Martin, Jr., *Judge*) granting summary judgment in favor of Defendants–Appellees Time Warner Inc. and Time Inc. (collectively, "Time").[1]

Dinaco seeks to hold Time liable for debts incurred by Patient Education Media, Inc. ("PEMI") on several theories: that Time and PEMI were joint venturers; or that PEMI had actual or apparent authority to enter into contracts with Dinaco on behalf of Time. In November 1994, Paul Dinan, an employee of Dinaco and the brother of Dinaco's CEO, Jim Dinan, read an article in *Advertising Age* that indicated Time was "announcing plans for a new joint venture" called "Patient Education Media" that would market and promote a line of educational medical videos. In early 1995, Time and PEMI entered into a "Product Development and Trademark Agreement," in which Time licensed the TIME LIFE MEDICAL® trademark to PEMI for use on its products and in its advertising in exchange for royalties based on a percentage of PEMI's net revenues.

Several months after reading the magazine article in 1994, Paul Dinan contacted Meg Walsh, PEMI's marketing director, and inquired about doing business with the new venture. Walsh indicated that PEMI was not ready to discuss business at that time. In August 1995, Walsh called Paul Dinan and asked that he come in for an interview at PEMI's office, located in the Time–Life Building. Paul Dinan and Conrad Hade, another Dinaco employee with experience in the type of project PEMI was going to launch, met with Walsh. At the meeting Walsh gave Dinan a press kit, the first page of which had "Time Life Medical" written across the middle and

---

**1.** Although Dinaco initially instituted suit against Time Warner, Inc., Time Inc., TLPI Co. and Time Publishing Ventures, Inc., Dinaco withdrew all claims against defendants TLPI Co., and Time Publishing Ventures, Inc., in response to the motion for summary judgment.

"Patient Education Media, Inc." across the bottom.

In October 1995, after several initial meetings with Dinaco representatives, James Arnold, then Vice President of Sales and Marketing for PEMI, verbally accepted Dinaco's written proposal for production of the display units.[2] Dinaco then began producing the display units and in February 1996 began distributing them. A formal written contract, the Point-of-Purchase Display Agreement, was provided to Dinaco from PEMI in February. From that time through December 1996, Dinaco continued to produce the units and perform services for PEMI even though PEMI had fallen $1,284,471.63 behind in its payments to Dinaco.[3] During these ten months Dinaco billed PEMI directly for its services.

The record reflects that PEMI's offices were located in the Time–Life Building and that when Dinaco employees visited PEMI's offices they were given Time security passes. The record further indicates that Time returned a trademark royalty payment to PEMI in November 1996 and that Time forgave five months' rent due under a lease with PEMI. In March 1997, PEMI filed a Chapter 11 petition. Unable to obtain relief in the Bankruptcy Court, plaintiff filed this suit in September 1998.

Following discovery, Time moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The district court granted Time's motion and dismissed the complaint. The court found that Time and PEMI were not engaged in a joint venture because there was no agreement between them to share profits or losses.

The court noted that Dinaco's reliance on a royalty provision in the Product Development and Trademark Licensing Agreement was misplaced as that provision was not an agreement to share profits. *See Steinbeck v. Gerosa,* 4 N.Y.2d 302, 317–18, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958). Similarly, the court noted that the return of a royalty payment to PEMI by Time was not evidence of loss sharing, but rather a business courtesy extended to PEMI during a time when PEMI was experiencing a cash flow problem. The court further held that Dinaco had identified no words or conduct by Time from which PEMI could reasonably have interpreted that Time actually viewed PEMI as Time's agent. Finally, the court held that, even assuming Time's actions were sufficient to create the appearance that PEMI had authority to act for Time, Dinaco must show that it reasonably relied on those acts to its detriment. According to the court, Dinaco's reliance was unreasonable as a matter of law.

We agree with the district court that PEMI and Time were not engaged in a joint venture. We further agree with the district court that Dinaco's submissions to the district court failed to create a triable issue of fact as to whether PEMI had actual authority to act on Time's behalf. Lastly, Dinaco's submissions failed to create a triable issue of fact as to whether PEMI had apparent authority to act on Time's behalf.

■ A joint venture pursuant to New York law requires five elements:

(1) two or more persons must enter into a specific agreement to carry on an en-

---

**2.** A copy of that proposal is not part of the record.

**3.** Dinaco seeks damages of $2,220,775.85 plus interest: $1,284,471.63 for outstanding invoices and the additional $1 million for money alleged owed for (a) merchandise and inventory manufactured but not delivered totaling $456,299.22, (b) labor and equipment costs totaling $400,000, and (c) financing costs totaling $80,000.

terprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.

*Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 701 (2d Cir.1990). The district court correctly noted that the royalty agreement between PEMI and Time Life Inc., which provided Time Life with a royalty of 10% of PEMI's net revenues, was not evidence of an agreement to share profits. *Steinbeck,* 4 N.Y.2d at 317–18, 175 N.Y.S.2d 1, 151 N.E.2d 170. Under *Steinbeck,* a royalty agreement is not an agreement to share profits as joint venturers; royalties are simply the contract price paid for licensing a trademark. *See id.* at 318, 175 N.Y.S.2d 1, 151 N.E.2d 170 ("The sums payable to petitioner by way of royalties were merely the price for the licensing of certain of his literary rights.... The relationship between an author and a publisher is not that of joint venturers merely because the publisher is to pay the author on the basis of receipts from the sale of books."). The agreement between PEMI and Time established contractual obligations, not a business enterprise.

▮▮▮ Furthermore, even if the royalty agreement did satisfy the profit-sharing requirement for a joint venture, Dinaco did not provide any evidence that Time agreed to share losses. "An indispensable essential of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business *and submit to the burden of making good the losses.*" *Id.* at 317, 175 N.Y.S.2d 1, 151 N.E.2d 170. The return of

a royalty check to PEMI, providing PEMI with various administrative services and office amenities, and the forgiveness of past due rent indicate that Time supported and extended business courtesies to PEMI. This does not establish that Time agreed to accept the risk of PEMI's video business, or that Time agreed to "submit to the burden of making good the losses" of PEMI. *Id.* Certainly, Time had an interest in seeing PEMI succeed; its royalty revenue under the PEMI/Time contract depended on it. However, Time never guaranteed or agreed to guaranty PEMI's financial or contractual obligations.

▮▮▮ The district court also properly rejected Dinaco's contention that PEMI had actual authority to enter into an agreement with Dinaco on behalf of Time. Actual authority "is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Minskoff v. Am. Express Travel Related Servs. Co.,* 98 F.3d 703, 708 (2d Cir.1996) (quoting RESTATEMENT (SECOND) OF AGENCY § 7 cmt. a (1958) [hereinafter RESTATEMENT](internal quotation marks omitted)). "Such authority may be express or implied, but in either case it exists only where the *agent* may reasonably infer from the *words* or *conduct* of the *principal* that the principal has consented to the agent's performance of a particular act." *Id.* (citing RESTATEMENT § 7 cmt. b) (emphasis added).

▮▮▮ According to Dinaco, PEMI portrayed itself as an affiliate and "may indeed have believed that [Time] wanted [PEMI] to act as [Time's] agent." Although Dinaco points to evidence showing a relationship between PEMI and Time, we agree with the district court that Dinaco has not put forth any words or conduct

by Time that PEMI could reasonably have interpreted to mean that Time authorized PEMI to enter into agreements on Time's behalf.

■ Finally, Dinaco contends that the district court erred in granting summary judgment against it on its claim that PEMI had apparent authority to act for Time. Apparent authority arises from the "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him." *Minskoff*, 98 F.3d at 708 (quoting RESTATEMENT § 27) (internal quotation marks omitted).

■ The district court assumed for the purpose of the summary judgment motion that Time's actions created an appearance that PEMI had authority to act for Time, but held Dinaco's reliance thereon unreasonable as a matter of law. Dinaco argues that the issue of its reliance—since it must be reasonable—is inherently a fact question. Dinaco points to several documents that it contends lead it "to believe it was dealing with a Time Life affiliate." In addition, Dinaco states that the first time Dinaco employees met with PEMI's Marketing Director, she noted her pride to be in a venture supported by one of the greatest publishers in the world.

In our view, reliance on those representations was unreasonable as a matter of law. To hold Time liable under a theory of apparent authority, Dinaco must show that it reasonably believed that PEMI entered into the agreement with Dinaco on behalf of Time and not on its own behalf. The record clearly illustrates that one of the very first documents Dinaco received from PEMI was a press kit. The front of the

kit contains both "Time Life Medical" and "Patient Education Media, Inc." On receipt of the kit, Dinaco was on notice it was dealing with a separate corporate entity. This is not to suggest that one corporation may not be the agent for another. While the juxtaposition of the two companies' names might suggest some relationship between the two, it does not imply or confirm that one serves as the other's agent. Indeed, there was a relationship between Time and PEMI—a licensing agreement in which PEMI was granted a license to use Time's trademark. If advertising is the stuff of agency then every advertisement by a franchisee with the franchisor's mark would confirm an agency.

Similarly, the written Point–of–Purchase Display Agreement dated February 1996, and received by Dinaco February 21, 1996, is solely between PEMI and Dinaco. There is no mention of Time anywhere in the document. Rather, the agreement specifically and clearly articulated that PEMI was the contracting party. Moreover, while the contract itself remained unexecuted, there is nothing in the record to suggest that Dinaco attempted to repudiate the contract upon receipt, when it must have become clear to Dinaco that PEMI was acting on its own. In fact, Dinaco continued to do work for PEMI from February 1996 through December 1996. Furthermore, Dinaco billed PEMI directly throughout the relationship for its services and sent those invoices to the Vice President of Sales and Marketing for PEMI. Additionally, as early as January 16, 1996, Jim Dinan sent letters to James Arnold in his capacity as "Senior Vice President, Patient Education Media Inc." These acts confirm that Dinaco knew it was dealing with PEMI as an independent party and not as Time's agent.[4]

---

4. Dinaco argues that even if its reliance was unreasonable as a matter of law after it re-

ceived the draft contract in February 1996, reliance prior to that time was not unreason-

Indeed, Dinaco is hard pressed to establish it ever viewed the PEMI/Time arrangement as one of agent and principal. PEMI was delinquent in its payments to Dinaco from the outset. Yet between February and December 1996, Dinaco continued to supply merchandise and perform services for PEMI even though PEMI had fallen more than $1,200,000 behind in its payments. Throughout PEMI's delinquency, no one at Dinaco contacted Time to demand Dinaco's invoices be paid. The record clearly establishes that Dinaco's reliance, if any, on what it came to view as an agency relationship only came into clear focus *after* PEMI's default. Apparent authority for an agency relationship depends upon reasonable reliance at the time of a contract—not after the agent's insolvency.

For the foregoing reasons the district court's judgment of October 28, 2002, granting summary judgment in favor of Defendants–Appellees, is hereby AFFIRMED.

able. Dinaco asserts the district court should have given it the opportunity to proceed to trial and prove the amount of damages it sustained up to February 21, 1996. We agree with the district court that upon receipt of the press kit, Dinaco was on notice it was dealing with Patient Education Media, Inc. Any asser-

tion by Dinaco after this point that it was dealing with Time was unreasonable as a matter of law. The draft contract and various correspondence between the parties simply provides further evidence that Dinaco's belief was unreasonable.