OPINION OF THE COURT
Kristin Booth Glen, J.
If a probationary public employee claims she was fired because of pregnancy discrimination, and her employer offers a legitimate nondiscriminatory basis for her termination, when is a hearing required, and what is the appropriate *240 standard of review? The instant case presents this important question, apparently of first impression in New York. For the reasons discussed below I hold that the "mixed-motives” analysis of title VII of the Civil Rights Law of 1964 (42 USC § 2000e et seq.; (Title VII) adopted by the Supreme Court in Price Waterhouse v Hopkins (490 US 228 [1989]) should be applied in determining this differently stated[1] but analogous claim of sex discrimination.[2]
Despite the generally limited scope of judicial review in probationary employee termination cases, such analysis is both consistent with the existing "bad faith” exception (see, e.g., Matter of Johnson v Katz, 68 NY2d 649 [1986]; Kroboth v Sexton, 160 AD2d 126 [1st Dept 1990]; and discussion, infra), and with the purposes of State and Federal antidiscrimination laws, especially in light of the barriers still remaining for women in nontraditional employment.[3] Before turning to the *241 law, however, the procedural posture and facts of the case must be briefly addressed.
PROCEDURAL POSTURE
This is a CPLR article 78 proceeding brought by petitioner, Nina Card, to challenge the determination of respondent, Allyn R. Sielaff, Commissioner of the New York City Department of Correction, to terminate her services as a probationary correction officer. She claims that her termination was based on impermissible pregnancy-based discrimination in violation of Title VII and seeks reinstatement with back pay and seniority, or in the alternative, a fact-finding hearing. Respondent has answered and seeks dismissal of the petition on the grounds that petitioner was terminated in good faith based on a record of excessive absence, lateness and a substandard level of performance.
FACTUAL AND PROCEDURAL BACKGROUND
Petitioner was appointed to the position of correction officer by the New York City Department of Correction effective September 4, 1989. Her probationary period was 18 months. During this period she was out sick on 5 occasions for a total of 19 days. She was also late on 10 occasions for a total time of 1 hour and 42 minutes. Petitioner was terminated on March 13, 1991, the last day of her probationary period.
Petitioner does not contest the accounting of the late and sick days, but argues that the sick days were excusable absences because they were pregnancy related. Petitioner argues that three of the five sick day periods (13 of the 19 days) were the result of temporary disability related to her pregnancy. She informed the Department of Correction of her pregnancy on January 5, 1990 and was subsequently put on medically monitored restricted (MMR) duty from January 5 until April 11 of 1990. During this period she was absent from work due to sickness on: January 18, January 30 through February 2 and from February 8 through February 20. On each of these occasions, petitioner complained of nausea and vomiting.
While at work on January 19, 1990 petitioner sought treatment for her nausea and vomiting, symptoms which occurred during her tours of duty. She reported to the Rikers Island Health Services Unit at Montefiore Medical Center where the attending physician diagnosed "Intrauterine Pregnancy-Possi *242 ble Methane Exposure.” On that same date petitioner filed a workers’ compensation claim claiming injury as a result of exposure to methane gas. Petitioner voluntarily terminated her pregnancy in February 1990 upon learning that she may have been exposed to methane gas on Rikers Island, and fearing that the exposure could have detrimental effects upon the fetus. Petitioner returned to full duty on April 12, 1990.
On May 15, 1990 petitioner was informed by letter that upon her next absence she would be placed in the chronic absent category. She was not sick again until September 4 through September 9, 1990 (five days) and on December 8, 1990 (one day). Petitioner states that she never received notification that she had been placed in the chronic absent category. Her termination report does not indicate any such record.
Respondent contends that, in addition to excessive absences, petitioner’s termination was based on her lateness and substandard performance. Petitioner was late on 10 occasions: September 22, 1989 (15 mins.); December 18, 1989 (1 min.); January 2, 1990 (30 mins.); May 18, 1990 (5 mins.); June 30, 1990 (5 mins.); October 9, 1990 (10 mins.); October 12, 1990 (1 min.); November 16, 1990 (5 mins.); December 3, 1990 (15 mins.) and December 4, 1990 (15 mins.). Petitioner was not disciplined for any of these infractions, but was given a corrective counseling interview on January 7, 1991 regarding her latenesses on December 3 and 4, 1990. The interview form is imprinted with the following: "Recommendation: This corrective interview be sufficient at this time. Should a pattern continue, strict disciplinary action may result.”[4] Petitioner was never late subsequent to the interview, nor was she absent again during the probationary period.
Respondent also cites petitioner’s allegedly substandard performance evaluations as grounds for termination. On February 7, 1991 she was rated between the "satisfactory” and "needs improvement” categories. From five evaluators she received one each of the following ratings: unsatisfactory; satisfactory/needs improvement; exceeds requirements; needs improvement; and satisfactory. One of the evaluators submit *243 ted an additional memo outlining petitioner’s weaknesses: negative attitude and laziness.[5]
Petitioner argues that the evaluations and lateness record were not the basis of her termination. She contends instead that she was terminated because of absences which were mainly attributable to her pregnancy and subsequent abortion. Petitioner argues that termination of an employee based bn pregnancy-related absences demonstrates bad faith and is unlawful and discriminatory because it violates Title VII and Executive Law § 296.
Petitioner also argues that termination based on pregnancy-related absences violates the departmental pregnancy policy which "reflects a commitment of nondiscrimination towards the rights of pregnant employees,” Teletype Order No. 2367-0, April 27, 1989 and Teletype Order No. 2095-0, April 14, 1989, which states: "All sick absenteeism that is related to pregnancy is not to be counted in calculations of sick days towards categories A and B per directive #2258.”[6] She thus argues that she has raised a triable issue as to whether her termination was based on her pregnancy-related absences,[7] entitling her to an evidentiary hearing.
THE LAW
In order to properly consider these facts and determine the appropriate relief, it is necessary to briefly review several related areas of law — judicial review of "bad faith” probationary termination, pregnancy discrimination and discrimination based on disability, and, finally, Price Waterhouse’s mixed-motive analysis and ordering of burdens.
ARTICLE 78 — BAD FAITH
It is well settled that a probationary employee may be *244 discharged at will, without a hearing, without charges being filed and without the provision of specific reasons. (Matter of Talamo v Murphy, 38 NY2d 637 [1976].) The scope of review in an article 78 proceeding involving the termination of a probationary employee is limited to whether the termination was made in bad faith. (Matter of Johnson v Katz, 68 NY2d 649, supra.) The burden is upon the petitioner to demonstrate that the termination was made in bad faith; a bad-faith determination is defined as one based on constitutionally impermissible purpose or in violation of statutory or decisional law. (Matter of Soto v Koehler, 171 AD2d 567, 568 [1st Dept 1991], citing Matter of York v McGuire, 63 NY2d 760, 761 [1984].)
Thus if petitioner’s termination violated Federal or State antidiscrimination laws it would, by definition, have been in bad faith. This is because, as the Court of Appeals has held, a probationary employee may be fired for any reason or no reason but cannot be fired for a discriminatory reason. (Matter of State Div. of Human Rights v County of Onondaga Sheriff’s Dept., 71 NY2d 623 [1988].)
EMPLOYMENT DISCRIMINATION — DISABILITY
Here, petitioner’s claim of statutory violation and thus of bad faith depends on her allegation that respondent unlawfully relied on her authorized use of sick leave in connection with her pregnancy and attendant disorders,[8] and that such reliance constitutes prohibited discrimination.
New York State’s Human Rights Law (Executive Law § 296 [1]) provides in relevant part:
"It shall be an unlawful discriminatory practice:
"(a) For an employer * * * because of the * * * sex, or disability * * * of any individual * * * to discharge from employment such individual”.
The burden is on petitioner to establish a prima facie case of *245 discrimination based on disability. (See, Matter of Maloff v City Commn. on Human Rights, 46 NY2d 908 [1979]; Matter of Pace Coll. v Commn. on Human Rights, 38 NY2d 28 [1975].)

Pregnancy-Related Disability

The status of being pregnant does not qualify as a disability per se (Wunning v Johnson, 114 AD2d 269 [3d Dept 1986], appeal denied 68 NY2d 601 [1986]). A pregnant employee must demonstrate actual disability and medical necessity for utilizing sick leave. (Matter of State Div. of Human Rights v Board of Educ., 51 AD2d 357, 360-361 [3d Dept 1976], affd 40 NY2d 1021 [1976].)
Petitioner, as a pregnant public employee, "must be permitted to take advantage of her sick leave to the same extent as if she were suffering from some other temporary physical disability”. (State Div. of Human Rights v Board of Educ., 54 AD2d 1115 [4th Dept 1976] quoted in Wunning v Johnson, supra, at 271.) Since respondents clearly relied on petitioner’s absence record, apparently including those absences which were pregnancy related, she would seem to have made out a prima facie case of prohibited disability discrimination. After such a prima facie case, the burden shifts to respondent to produce evidence to establish an " 'independent legitimate [nondiscriminatory] reason [for its termination of its employee] which was neither a pretext for discrimination nor was substantially influenced by impermissible discrimination’ ”. (Matter of Maloff v City Commn. on Human Rights, 46 NY2d, supra, at 910; Klausner v Propper Mfg. Co., 53 Empl Prac Dec ¶ 39,876, supra.)

Mixed-Motives Analysis

The problem for petitioner, applying these traditional legal frameworks, is that even if the January and February 1990 absences are disregarded, her lateness record and performance evaluations over the 18-month probationary period might well provide a good-faith and rational basis for firing. (See, Matter of Soto v Koehler, supra; Matter of Ferone v Koehler, 160 AD2d 572 [1st Dept 1990].) Thus, respondent may well have had both a permissible and impermissible (or bad faith) discriminatory basis for terminating petitioner. The question becomes which was the "real” reason, and how to uncover it. This is precisely the dilemma which mixed-motives analysis was designed to address.
To make out a "mixed-motives” case petitioner must, as she *246 has here,[9] show that respondent’s determination "was the product of a mixture of legitimate and illegitimate motives”. (Price Waterhouse v Hopkins, supra, at 247.) A "mixed-motives” case is one in which an employer has created uncertainty as to causation by knowingly giving substantial weight to an impermissible criterion in firing an employee. Once petitioner has made out a prima facie case of mixed motives, the burden shifts to the employer to show that its employment decision would have been the same absent the unlawful motive. (Price Waterhouse v Hopkins, 490 US 228, 270-277, supra, cited in Klausner v Propper Mfg. Co., supra, at ¶ 62,266.)
Although Price Waterhouse (supra) is a Supreme Court decision interpreting a Federal statute, it has been cited by our appellate courts in more traditional employment discrimination cases. (See, e.g., Matter of Grumman Aerospace Corp. v New York State Div. of Human Rights, 151 AD2d 573 [2d Dept 1989], lv denied 75 NY2d 701 [1989] [burdens of proof in age discrimination claim under New York law].) In Klausner (supra), a Judge of this court also utilized the Price Water-house analysis to decide a discrimination action brought pursuant to New York’s Human Rights Law.
In addition, since termination in violation of a statute requires a finding of bad faith, petitioner’s argument as to violation of Title VII requires direct application of the Price Waterhouse test for that portion of her claim. There is no basis in law or reason for not applying its mixed-motive analysis to the totality of her claim here.[10]
I therefore apply the Price Waterhouse analysis to this classic mixed-motives case, and find that, on this record, petitioner has met her burden of showing a mixture of permissible and impermissible motives. [11] The next question, whether *247 respondent nevertheless terminated petitioner in good faith, and not because of her utilization of authorized pregnancy-related absences, can only be decided after a hearing[12] at which respondent will bear the burden of proof on that issue. (See, e.g., Ditaranto v State Div. of Human Rights, 111 AD2d 702 [1st Dept 1985].) In order to prevail respondent will have to prove, by a preponderance of the evidence, that it would have made the same determination even if it had not taken petitioner’s authorized, pregnancy-related absences into account. (Price Waterhouse v Hopkins, 490 US, supra, at 258.)
CONCLUSION
Petitioner has met her burden of demonstrating that there are disputed issues of material fact as to whether she was fired for good-faith reasons or discriminatory reasons and therefore she is entitled to an evidentiary hearing at which the Price Waterhouse ordering of burdens must be applied. Petitioner is directed to file a note of issue within 20 days so that this matter can be assigned to a Trial Judge for hearing.

. This is not a claim for reinstatement, back pay or other potentially available remedies brought under Title VTI or analogous State or city statutes. At least one decision has recognized the applicability of Price Waterhouse v Hopkins (supra) to such claims in the State courts (see, Klausner v Propper Mfg. Co., 53 Empl Prac Dec ¶ 39,876 [CCH] [Sup Ct, NY County 1989 (Saxe, J.)]).

. As originally interpreted by the Supreme Court, pregnancy discrimination was not covered under Title VII (General Elec. Co. v Gilbert, 429 US 125 [1976], reh denied 429 US 1079 [1977]). Congress responded to the General Elec, decision by passing the Pregnancy Discrimination Act of 1978 (the PDA; 42 USC § 2000e [k]) which specifies that sex discrimination includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions”. (See, e.g., California Fed. Sav. & Loan Assn. v Guerra, 479 US 272 [1987].)

. Despite the existence of antidiscrimination laws, for almost three decades, job segregation has persisted, with "most women * * * crowded into a small percentage of prevailing job categories [with] about three fifths * * * in occupations comprised of at least 75 percent female workers.” (Rhode, Justice and Gender, at 163 [1989].) Women in nontraditional jobs— like correction officers, firefighters, construction workers, miners, etc. — may face different, sometimes less obvious forms of sex discrimination either because of unarticulated stereotypes (e.g., Williams, Gender Differences at Work: Women and Men in Nontraditional Occupations [1989]), and/or, as in the case of sexual harassment, because of male hostility to their invasion of previously sacrosanct male bastions (see, e.g., Crull, Searching for the Causes of Sexual Harassment: An Examination of Two Prototypes, in Bose, Feldberg and Sokoloff, Hidden Aspects of Women's Work [1987]). Especially sensitive and vigilant application of antidiscrimination laws is thus required in order to insure real equality of opportunity for women in these nontraditional jobs. (See, Schultz, Telling Stories About Women and Work: Judicial Interpretations of Sex Segregation in the Workplace in Title VII Cases Raising the Lack of Interest Argument, 103 Harv L Rev 1749, 1832-1842 [1990].)

. Subsequent to the counseling session, petitioner wrote a letter to the Deputy Warden recognizing that her lateness was unacceptable and asking that she be given another chance.

. Petitioner attacks these evaluations as having been prepared in February 1991 "at which point Petitioner’s termination was a foregone conclusion of the department. As such [she argues] the evaluation [was] nothing more than a self-serving document created to justify the respondents’ decision”. Petitioner also alleges, on information and belief, that the single unsatisfactory grade "was submitted by the Personnel Captain and relates solely to petitioner’s record of absenteeism”.

. Neither party has submitted a copy of directive No. 2258.

. Significantly for petitioner’s argument, the record of sick leave absences submitted by respondents makes no distinction between those which were concededly pregnancy related, and those which were not. The termination record which they submitted also includes the record of petitioner’s latenesses, the medically monitored restrictive duty record, and the summary of performance evaluation discussed above.

. Department of Correction Teletype Order No. 20950 states: "1. all sick absenteeism that is related to pregnancy is not to be counted in calculations of sick days towards categories A and B per directive #2258.”
In addition, article X, § 2 of the collective bargaining agreement addressing sick leave states, in relevant part, "Each Correction Officer shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect”. Respondent does not claim that the sick leave taken during petitioner’s pregnancy was unauthorized or that petitioner failed to report her illness or otherwise violated departmental rules and regulations.

. An important fact on this record which supports such a finding is that petitioner received a chronic absence counseling warning in May 1990, when the only absences she had were pregnancy related and thus, pursuant to respondents’ own rules, apparently not to be counted.

. That is, even if New York antidiscrimination law were interpreted in a different manner, which it is not (see, discussion above) petitioner would prevail if she could meet the Price Waterhouse test in showing that Title VII’s prohibition on pregnancy discrimination had been violated. It makes no sense to apply different tests or analyses simply because this is an article 78 proceeding rather than a more traditional employment discrimination action.

. For example, to the extent that respondent allegedly relied on petitioner’s latenesses, rather than absences, it is important to note that once she was successfully counseled about that problem (with the warning *247 that, if it persisted, "strict disciplinary action may result”) she was never late again. Subsequent termination for infractions which have been counseled and never repeated creates a strong suggestion of bad faith (cf., Matter of Kroboth v Sexton, 160 AD2d 126, supra; Matter of Soto v Koehler, 171 AD2d 567, 571, supra [dissenting opn of Carro, J.]).

. Because the record before me is inadequate in many respects, a number of factual issues need to be clarified or determined at an evidentiary hearing. For example: Was petitioner required to, and did she provide medical documentation for each sick leave absence? What rules and regulations does directive # 2258 contain regarding rating the performance of an employee who has utilized sick leave? Were authorized pregnancy-related absences counted towards excessive absences? Finally, as the dispositive question, how much, or to what extent did respondent rely on authorized pregnancy-related absences in firing petitioner?