**Cheryl Obedin RIVKIN, Plaintiff,**

v.

**Sydney Reese COLEMAN, Defendant.**

No. 95 Civ. 6332(RWS).

United States District Court,
S.D. New York.

Oct. 15, 1997.

As Amended Oct. 21, 1997.

---

Jaroslawicz & Jaros (David Jaroslawicz, Robert J. Tolchin, of counsel), New York City, for Plaintiff.

Davidoff & Malito, LLP (Jack E. Bronston, of counsel), New York City, for Defendant.

## OPINION

SWEET, District Judge.

The defendant Sydney Reese Coleman ("Dr. Coleman") has moved for summary

judgment pursuant to Rule 56, Fed.R.Civ.P., to dismiss plaintiff Cheryl Obedin Rivkin's ("Ms. Rivkin") complaint. The original complaint sought liability on several New York State law grounds: (1) accounting; (2) breach of fiduciary duties; (3) fraud; (4) unjust enrichment; (5) tortious interference with contract; (6) discrimination on the basis of sex in violation of New York Executive Law § 296; (7) back pay; and (8) return of personal property. This Court dismissed claims one, three and five by opinion dated February 9, 1996. For the reasons set forth below, the motion for summary judgment will be granted for all remaining claims but for claim six, which alleges sex discrimination on the basis of pregnancy.

### Prior Proceedings

Defendant's motion for summary judgment was granted with regard to the claims for an accounting, fraud and tortious interference with contract by opinion dated February 9, 1996. *See Rivkin v. Coleman,* 914 F.Supp. 76 (S.D.N.Y.1996).

Subsequent to the first summary judgment motion, discovery was conducted regarding the remaining claims. The instant motion was filed by Dr. Coleman on April 7, 1997. The motion was argued on June 18, 1997, at which time the motion was deemed fully submitted.

### Facts and Background

The factual background of this case is set forth in the prior opinion of the Court, familiarity with which is assumed, and will only partly be repeated here. *See Rivkin v. Coleman,* 914 F.Supp. 76 (S.D.N.Y.1996). In August 1992, plaintiff was hired for secretarial duties by the defendant, Dr. Coleman, who is a physician specializing in plastic and reconstructive surgery. Ms. Rivkin's responsibilities expanded, she became the office manager, and her annual compensation increased from approximately $27,000 to $50,000.

Ms. Rivkin gave birth to her first child during her employment with Dr. Coleman. At that time, Dr. Coleman made arrangements for Ms. Rivkin to work part-time at home after giving birth, including, *inter alia,* shipping a computer to her home. Ms. Rivkin's salary was continued during her two-month leave after the birth of her son. Thereafter she returned to the same job full-time.

Approximately four years prior to hiring Ms. Rivkin, Dr. Coleman developed a surgical technique to transplant subcutaneous tissue within a patient's body, removing fat tissue from one part of the body and injecting it by means of a "cannula" into other areas of the body. The cannula is a finely-measured syringe-like instrument. Dr. Coleman has a patent application pending for this technique and the cannula, and a trademark application pending for the mark "lipostructure."

Ms. Rivkin, while employed as the office manager, assisted Dr. Coleman with developing the commercial exploitation of the cannula. Pursuant to this effort, Ms. Rivkin began negotiations with a prospective manufacturer. These negotiations, however, were never completed, and a contract was never consummated.

On June 16, 1995, Dr. Coleman and Ms. Rivkin had a heated discussion over the contents of a memo Ms. Rivkin had written setting forth the terms of her compensation for the cannula venture as well as the status of the cannula manufacturing negotiations. Their relationship immediately began to deteriorate. On June 20, Ms. Rivkin told Dr. Coleman that she was pregnant with her second child. In early July Dr. Coleman hired an employee who Ms. Rivkin alleges was intended as her replacement. Dr. Coleman fired Ms. Rivkin on August 7, 1995.

Ms. Rivkin's complaint claims that during her employment, she and Dr. Coleman formed a joint venture to develop the cannula, the gross profits of which were to be divided 20% to her and the balance to Dr. Coleman. She further alleges that Dr. Coleman fired her upon learning of her pregnancy. Dr. Coleman denies these allegations.

### Discussion

#### I. Standard For Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Keywell Corp. v. Weinstein,* 33 F.3d 159, 163 (2d Cir.1994) (a party is entitled to summary judgment if "resolving all ambiguities and drawing all factual inferences in favor of the non-moving party, there is no genuine issue of material fact to be tried"); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions."). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *See Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986). The disputed issues of fact must be "material to the outcome of the litigation," *id.* at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## II. *No Partnership–In–Fact Is Established*

 Where no written agreement exists, a partnership-in-fact may be established if "the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit.'" *Steinbeck v. Gerosa,* 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958). The indicia of partnership include: (1) sharing losses; (2) joint management and control; (3) ownership of partnership assets; (4) contribution of capital; and (5) sharing profits. *See Blaustein v. Lazar Borck & Mensch,* 161 A.D.2d 507, 555 N.Y.S.2d 776, 777 (1st Dep't 1990) (factors include "sharing in profits and losses, exercising joint control over the business and making of investments and possessing an ownership interest in the partnership"); *Brodsky v. Stadlen,* 138 A.D.2d 662, 526 N.Y.S.2d 478, 479 (2d Dep't 1988) (citing factors).

### 1. *Sharing Losses*

 Plaintiff has not provided evidence that she had an agreement with Dr. Coleman to share losses in the cannula venture. As the Court of Appeals held, "[a]n indispensable essential of a contract of partnership or joint venture ... is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses." *Steinbeck,* 4 N.Y.2d at 317, 175 N.Y.S.2d 1, 151 N.E.2d 170. Ms. Rivkin's claim that no loss-sharing agreement was necessary since the venture would consist predominantly of a royalty agreement with the manufacturer ignores essential facts. Dr. Coleman contends without refutation from Ms. Rivkin that the venture did, and would continue to, incur costs, including protecting the intellectual property, product liability insurance, and administration. By assuming sole responsibili-

ty for these costs, Dr. Coleman was in the position of risking financial loss if either the venture never earns revenue, or if revenue is earned but does not exceed the expenses. In this scenario, Ms. Rivkin would lose nothing.

■ Ms. Rivkin claims she has spent time on the venture without pay, and that the risk of loss of this "sweat equity" constitutes her loss-sharing agreement. Plaintiff's reliance on *Ramirez v. Goldberg,* 82 A.D.2d 850, 439 N.Y.S.2d 959 (2d Dep't 1981), however, is unhelpful. In *Ramirez,* the court stated that "[a]n individual who offers services for a share of the net profits from several transactions, risks losing the value of those services." *Id.* at 961. The court held, however, that the alleged sweat equity was insufficient to form a partnership because, *inter alia,* "plaintiff was not personally liable for any of the obligations of the enterprise." *Id.* Here too, Ms. Rivkin is not liable for the financial obligations undertaken for the cannula venture.

Moreover, even if sweat equity were sufficient evidence of an agreement to share losses, it would not apply in this case. Ms. Rivkin was at all times a salaried employee of Dr. Coleman, who has argued that the services performed by Ms. Rivkin were pursuant to her capacity as an employee, and not as a partner. It may be difficult to establish a dual relationship of employee and partner where, as here, the employee cannot clearly delineate which time and responsibilities were allocated to the salaried position, and which to the partnership venture. *Cf. Canet v. Gooch Ware Travelstead,* 917 F.Supp. 969, 988 (E.D.N.Y.1996) (employee did form joint venture where employer conceded offer of partnership on project, employee took leadership role and employee expressed willingness to undertake recourse debt in connection with project). Ms. Rivkin has simply offered no facts that would tend to establish that her time spent on the cannula project was uncompensated.

## 2. *Joint Management and Control*

■ Although Ms. Rivkin alleges facts that show her active involvement in the cannula venture, this does not amount to an exercise of control. Control may be established by showing, for example, authority to write checks or issue invoices. *See Ramirez,* 439 N.Y.S.2d at 961 (citing check and invoice writing authority as elements of control). Here, while Ms. Rivkin may have had a role in identifying and negotiating manufacturing contracts, she does not allege that she had sufficient control to consummate the agreement, which resided solely with Dr. Coleman. Furthermore, Ms. Rivkin does not claim that she ever held herself out as a partner with Dr. Coleman, either in her discussions with prospective cannula manufacturers or elsewhere. Ms. Rivkin's facts, therefore, simply do not show any exercise of joint management or control. Rather, as Dr. Coleman claims, the facts she alleges are consistent with the responsibilities of a salaried office manager in a small business.

## 3. *Ownership of Partnership Assets*

Intellectual property, including patents and trademarks, lies at the center of the cannula venture. Ms. Rivkin concedes, however, that these assets are solely owned by Dr. Coleman. However, she alleges that Dr. Coleman pledged the intellectual property rights to the partnership. She offers no evidence, documentary or otherwise, of a pledge. Furthermore, Ms. Rivkin claims no other assets of the alleged partnership in which she is even a co-owner. Accordingly, this factor detracts from her claim that she formed a partnership-in-fact with Dr. Coleman.

## 4. *Contribution of Capital*

Ms. Rivkin did not make capital contributions to the cannula venture. According to her deposition and memorandum of law, "the plaintiff has never claimed she made a cash contribution." Memorandum of Law in Opposition to Motion to Defendant's Summary Judgment Motion, June 5, 1997, at 27. Ms. Rivkin did, in a subsequent declaration, advert to small cash outlays. However, there is insufficient specificity with regard to these expenses to contradict her earlier assertion. On the other hand, Dr. Coleman did make monetary contributions, not the least of which was the Ms. Rivkin's salary paid for the time she spent assisting with the cannula venture. Accordingly, it appears that only

Dr. Coleman risked capital, and another indicia of partnership is therefore missing.

### 5. *Sharing Profits*

Even if Ms. Rivkin's allegation that Dr. Coleman agreed to pay her a percent of gross revenues were true, this would not be dispositive on the partnership issue. In *Ramirez*, the plaintiff claimed that a partnership-in-fact existed between himself and the defendant pursuant to which he was entitled to receive a share of the profits. The court stated, however, that "all of the elements of the relationship must be considered." *Ramirez*, 439 N.Y.S.2d at 961. In reversing the lower court, the appellate division held that a partnership was not formed since the plaintiff had not contributed capital, never held himself out as a partner, had no control over issuing checks or invoices, and assumed no personal liability for debts of the purported partnership. *Id. See also Steinbeck*, 4 N.Y.2d at 317, 175 N.Y.S.2d 1, 151 N.E.2d 170 (holding that, although sharing profits is an element of a joint venture, "[a]n agreement to distribute the proceeds of an enterprise upon a percentage basis does not give rise to a joint venture if the enterprise does not represent a joinder of property, skills and risks"); *Blaustein*, 555 N.Y.S.2d at 777 ("[T]he fact that an individual receives a share of the profits is not dispositive, since all of the elements of the relationship must be considered."); *Brodsky*, 526 N.Y.S.2d at 479–80 (holding no partnership-in-fact where plaintiff was salaried employee entitled to percent of gross profits but was not liable for losses and made no capital contribution).

Here too the facts fail to establish a partnership-in-fact even if there was a general agreement to pay Ms. Rivkin a percent of the cannula venture profits. Considering the entire relationship, the facts offered by Ms. Rivkin to refute Dr. Coleman's claim that no partnership-in-fact was formed do not give rise to sufficient ambiguity which would preclude summary judgment. She did not agree to share any losses, she was not personally liable for any venture debts, and she did not exercise control in the form of contract signing, check writing or any other form of partner-like authority. Furthermore, Ms. Rivkin did not contribute capital or own any partnership assets. Under these circumstances, an alleged agreement to provide incentive compensation in the form of a percent of revenues cannot be transformed into a claim of partnership-in-fact.

### III. *There Was No Unjust Enrichment*

■ To succeed on a theory of unjust enrichment, plaintiff must show: (1) enrichment; and (2) the enrichment is unjust. *See McGrath v. Hilding,* 41 N.Y.2d 625, 629, 394 N.Y.S.2d 603, 363 N.E.2d 328 (1977) ("[W]hether there is unjust enrichment ... must be a realistic determination based on a broad view of the human setting involved."); *see also Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir.1982) (citing *McGrath* ). The issue of whether Dr. Coleman's enrichment, if any, is unjust turns on the question of whether Dr. Coleman is in possession of property which rightfully belongs to Ms. Rivkin. Presumably the property at issue here is the royalty arrangement Dr. Coleman concluded with Byron Medical, Inc. ("Byron"). Although Ms. Rivkin did not negotiate the Byron agreement, she claims that her negotiation of an agreement with another manufacturer strengthened Dr. Coleman's hand, positioning him to obtain a better deal from Byron. Whether or not Ms. Rivkin's negotiations did contribute to a deal with Byron, the issue is whether such property is rightfully hers. This issue is resolved by reference to the preceding analysis resulting in dismissal of the partnership claim. There being no partnership-in-fact, and Ms. Rivkin having been a salaried employee while she assisted with developing the cannula venture, there is nothing unjust about any purported enrichment which may have accrued to her employer, Dr. Coleman.

### IV. *A Genuine Issue of Material Fact Exists Regarding Dr. Coleman's Motivation in Terminating Ms. Rivkin*

■ Ms. Rivkin alleges that her termination was unlawful since it was motivated by her pregnancy pursuant to New York Executive Law Section 296(1)(a), which provides that it is unlawful "[f]or an employer ... because of the ... sex ... of any individual

... to discharge from employment such individual." N.Y. Exec. Law § 296(1)(a) (McKinney's 1992 & Supp.1997).[1] Since the employer's intent is at issue, summary judgment in employment discrimination cases must be approached with great caution. *See Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).

Ms. Rivkin concedes that Dr. Coleman's termination decision was motivated at least in part by problems relating to the cannula venture. Dr. Coleman's dispute with Ms. Rivkin over the cannula venture is a legitimate motive for termination.[2] Ms. Rivkin does not claim that her employment with Dr. Coleman was anything other than an employment-at-will, and therefore she was subject to termination for any non-discriminatory reason, or for no reason at all. Thus, if Ms. Rivkin were not pregnant, her discharge would not be subject to legal sanctions.

Ms. Rivkin, however, alleges that notwithstanding the existence of a legitimate reason for her termination, the primary reason was because of her pregnancy. In the Title VII context the Supreme Court has characterized such claims as a "mixed-motives" theory. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1794, 104 L.Ed.2d 268 (1989). The mixed motives analysis was applied in the context of New York Executive Law Section 296 case in *Card v. Sielaff,* 154 Misc.2d 239, 586 N.Y.S.2d 191, 196–97 (N.Y.Sup.Ct.1992) (holding that plaintiff's Title VII claim requires direct application of the mixed motives test, and that "there is no basis in law or reason for not applying [the *Price Waterhouse*] mixed motives analysis" to the New York statute as well). *See also Fitzgerald v. Alleghany Corp.,* 904 F.Supp. 223, 227 (S.D.N.Y.1995) (Kaplan, J.) (applying Title VII mixed motives analysis to N.Y. Exec. Law § 296 claim because "[t]he standards governing burdens of proof in employment discrimination cases under the New York Human Rights Law typically are the same as those that apply in Title VII cases" (citing *Sogg v. American Airlines, Inc.,* 193 A.D.2d 153, 603 N.Y.S.2d 21, 23 (1st Dep't 1993), *leave to appeal dismissed,* 83 N.Y.2d 846, 612 N.Y.S.2d 106, 634 N.E.2d 602 (1994))). We therefore conclude that a New York court would, in the appropriate circumstances, apply the mixed motives analysis even in the absence of a concurrent Title VII claim.

In the Title VII context, the Second Circuit set forth the mixed motives analysis in *de la Cruz v. New York City Human Resources Admin. Dep't of Social Services,* 82 F.3d 16 (2d Cir.1996). "In a 'mixed motives' case, a plaintiff must initially proffer evidence that an impermissible criterion was in fact a 'motivating' or 'substantial' factor in the employment decision." *Id.* at 23. Accordingly, the "burden is greater than the level of proof necessary to make out a [pretext-based] prima facie case." *Id.* This greater burden results from the plaintiff's need to establish intent before the burden shifts to the defendant "to demonstrate that it would have reached the same decision even in the absence of the impermissible factor." *Id.* Under a pretext theory the plaintiff's prima facie case does not require showing intent before the burden shifts to the defendant to show a legitimate reason for the action.[3]

In *de la Cruz,* the court held that whereas the plaintiff had established a prima facie

---

1. Dr. Coleman argues that he is not an "employer" within the meaning of N.Y. Exec. Law § 296. N.Y. Exec. Law § 292(5) defines "employer" as not including "any employer with fewer than four persons in his employ." At the time Ms. Rivkin was dismissed, Dr. Coleman had four full time employees. Although Dr. Coleman argues that one employee was probationary, he does not advance any New York case holding that a "probationary" employee is not an "employee" for Section 292(5) purposes. Accordingly, Section 296 does apply to Dr. Coleman.

2. Dr. Coleman also argues that he terminated Ms. Rivkin because she copied confidential docu-

ments in violation of her employment agreement. Since the cannula dispute is a legitimate reason for terminating Ms. Rivkin, we need not discuss the strength of this assertion.

3. In a pretextual claim, the burden of production proceeds in three steps. Step one is to establish the plaintiff's prima facie case is established by showing: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment decision; and (4) either the position remained open or she was replaced by someone not a member of his protected class. *See McDonnell*

case under the pretext theory, his "proffer of evidence of an impermissible motive" was inadequate to sustain a mixed motives theory. *de la Cruz,* 82 F.3d at 23. In this regard, the court's analysis in step one of the mixed motives analysis was similar to the analysis in step three of its pretextual analysis, where the court held that plaintiff had not shown sufficient evidence that the legitimate reason advanced by the employer was pretextual. *Id.* at 21–22. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1185 (2d Cir.1992) (concluding that proof required to trigger mixed motive analysis is same as plaintiff's burden in last step of pretext analysis). Thus, the court concluded that the employer's alleged comments that the employee's "problems were 'cultural'" and that "he and his new Hispanic supervisor 'will understand each other better'" were not direct evidence of discrimination when made in the context of a "justified concern over language skills." *Id.* at 23.

The evidence that Ms. Rivkin offers to demonstrate discrimination relating to her second pregnancy is: (1) Dr. Coleman's alleged statements before he became aware of her pregnancy that she should wait a long time before becoming pregnant again; (2) Dr. Coleman's alleged statement after learning of Ms. Rivkin's pregnancy that she had become pregnant too soon; (3) alleged steps made to reduce the pregnancy-related benefits offered by the firm, including elimination of maternity care from the health care policy and change of pregnancy leave from paid to unpaid; and (4) the close proximity in time between making Dr. Coleman aware of her pregnancy and the preparations by Dr. Coleman to replace her culminating in her termination.

Dr. Coleman's statements give rise to a genuine issue of fact regarding whether Ms. Rivkin's pregnancy was a substantial or motivating factor in her termination. As the Second Circuit said, the plaintiff must "present [ ] evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude" in an amount "sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992). Here, Dr. Coleman's alleged statements regarding his preference that a long time pass before Ms. Rivkin became pregnant again raises the issue of whether he acted on this preference when he made the termination decision. Such statements cannot be glossed over where, as here, the person making the statement is in a position of power. The possibility of reprisal for bearing children is a focus of the discrimination law. Whether this in fact occurred here is a matter properly left for the jury.

## V. *Plaintiff's Seventh and Eighth Claims Are Dismissed*

Dr. Coleman asserts, and Ms. Rivkin does not dispute, that there is no back-pay or other compensation owing and that all personal property was returned. Accordingly, these claims are dismissed.

## *Conclusion*

For the reasons set forth above, defendant's motion for summary judgment will be granted for plaintiff's claims two, four, seven and eight. Defendant's motion for summary judgment for plaintiff's claim six, alleging sex discrimination on the basis of pregnancy, is denied.

The action is placed upon the ready trial calendar.

It is so ordered.

---

*Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

If the plaintiff meets her burden of establishing a prima facie case, then step two is for the employer to articulate a legitimate, independent, nondiscriminatory reason for its action. Step three requires the plaintiff to show by a preponderance of the evidence that the defendant's proffered reasons are a pretext for discrimination. *Id.* at 802–04, 93 S.Ct. at 1824–25.

The plaintiff, of course, bears the ultimate burden of persuading the trier of fact that discrimination played a role in the decision. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).